# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-60559 |
| | § | |
| DONALD VINCENT KEITH AND | § | |
| JOCQUALINE SUSAN KEITH | § | |
| | § | |
| DEBTORS | § | CHAPTER 7 |
| | § | |
| | § | |
| KAPITUS SERVICING, INC., | § | |
| AS SERVICING AGENT FOR | § | |
| KAPITUS, LLC | § | |
| Plaintiff, | § | |
| | § | ADV.PROC.NO. 22-06003 |
| VS. | § | |
| | § | |
| DONALD VINCENT KEITH | § | |
| Defendant. | § | |

_____

ORAL DEPOSITION OF
DAVID WOLFSON

JULY 6, 2023

_____

ORAL DEPOSITION OF DAVID WOLFSON, produced
as a witness at the instance of the Employer and Carrier,
and duly sworn, was taken in the above-styled and numbered
cause on Thursday, July 6, 2023, from 9:36 a.m. to 2:38
p.m., before Janie Garcia, Notary in and for the State of
Texas, reported by machine shorthand, appearing remotely,
pursuant to the Federal Rules of Civil Procedure and any
provisions stated on the record or attached hereto.

DAVID WOLFSON - July 06, 2023

```
 1                    A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3        Ms. Elizabeth M. Lally
          Spencer Fane LLP
 4        13520 California Street, Suite 290
          Omaha, Nebraska  68154
 5        elally@spencerfane.com

 6

    FOR THE DEFENDANT:
 7        Mr. Jim Dunnam
          Dunnam & Dunnam LLP
 8        4125 West Waco Drive
          Waco, Texas  76714
 9        jimdunnam@dunnamlaw.com

10


11

    Also Present:
12
       Ms. Nicole Ratliff -  nicole@dunnamlaw.com
13     Ms. Tara E. Holterhaus - tholterhaus@spencerfane.com

14

15

16

17

18

19

20

21

22

23

24

25
```

DAVID WOLFSON  -  July 06, 2023

```
 1                  I N D E X

 2                                            PAGE

 3    Appearances.................................   2

 4   DAVID WOLFSON
 5    Examination by Mr. Dunnam...................   5,
                                                    55,
 6                                                 112
      Examination by Ms. Lally...................  136
 7    Re-Examination by Mr. Dunnam...............  151

 8

 9    Reporter's Certificate.....................  153

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              E X H I B I T S
2

3         DEFENDANT'S EXHIBITS INDEX        PAGE
4

5   No. 2 ....................................  78
    2023-02-04 Final Kapitus
6   No.4 ....................................  11
    2023-06-29 Deposition Notice
7   No. 6  ..................................  23
    Application for Funding
8   No. 7 ...................................  63
    Kapitus Fwd Purchase Agreement
9   No. 8...................................  25
    Kapitus Acknowledgement
10  No. 9...................................  52
    DocuSign Certificate of Completion
11  No. 11..................................  11
    Demand Letter
12  No. 13..................................  73
    Aug 2021 Email
13  No. 19..................................  62
    Sales Referral
14  No. 21.................................. 117
    Tex Mix Check
15  No. 22.................................. 124
    Foxworth Check
16  No. 23.................................. 127
    Foxworth Lawsuit
17

18

19  PLAINTIFFS EXHIBITS INDEX            PAGE

20  No. 6................................... 144
       Agreement as Filed Application For Funding
21  No. 8................................... 149
       Application For Funding
22  No. 9...................................  143
       Representations and Acknowledgement
23

24

25

**DAVID WOLFSON  -  July 06, 2023**

1    A.  Are you talking about at the time he applied for

2  financing, or after the default?

3    Q.  I'm talking about the very, very first time that

4  Mr. Keith was contacted or contacted anyone about

5  obtaining some financing.

6    A.  That came through Lendio.

7  ███████████████

8  ██████████████████████████

9  ███████████████████████████████████

10 ███████████████████████████████████

11 ████████████

12        Those people either contact them or through

13 their portal or any other way; that would be a Lendio

14 issue.  They may have a sale's team -- I don't -- that

15 actively pursues cold-calling.  I have no idea, that's

16 their company.

17        They receive an application.  They send it

18 out to various finance companies, including us.  This is

19 primarily done online though different portals.  And they

20 usually act as the intermediary to pass through on

21 request; so until the time of financing.

22    Q.  And so my question was, how did -- how was any

23 contact -- what was the first contact?  Either with Mr.

24 Keith in regard to the transaction we're here today

25 discussing?

**DAVID WOLFSON  -  July 06, 2023**

1  was done, that is the best information I have.  If there

2  is an e-mail produced between him and Lendio that perhaps

3  I didn't see the date because it's small, I didn't see

4  anything unusual; then that might have an earlier date.

5         That would be in the documents.  If you want

6  me to look at and I'll identify if there's Kapitus on

7  there anywhere.  But anything between him and Lendio would

8  have nothing to do with me or us, prior.

9     Q.  Other than he never would've gotten financing

10  with you had he not had communicates with Lendio.  That

11  does have to do with you, doesn't it?

12         MS. LALLY:  Objection, argumentative.

13     A.  Well, he could've applied somewhere else.  He

14  could've applied to us directly.  So, you're really

15  pulling for some sort questions I don't have.  But

16  specifically, in this matter, it came through Lendio.

17     Q.  (Examination by Mr. Dunnam)  Right --

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████

20      ████████████████████████████████████████

21  ██████████████████████████████████████████

22  ████████████████████████████████████████████

23  from Lendio.

24     Q.  So, Mr. Keith never communicated directly with

25  Kapitus prior to this being funded; is that right?

1    A.  I did not see any, no.

2    Q.  Well, I didn't ask if you saw any.  I want to

3 know if there was any or not.  You are Kapitus for today.

4         And I need to know if there's any

5 communications between Kapitus and Mr. Keith prior to

6 funding?

7    A.  And I am telling you I do not see any in our

8 records.

9    Q.  So you don't know, it's the answer?  Or you don't

10 think there was any?

11   A.  I don't think there was.

12   Q.  Okay.  And so anything that was said or done

13 prior to funding, Kapitus is unaware if it's not shown in

14 the document; is that fair?

15   A.  Or their logs or electronic records, that is

16 correct.

17 ██████████████████████████████████████████████

18 ████████████

19 ████████████████████████████████

20 ███████████████████████████████

21 ████████████████████████████████████

22 questions.  If you -- show me the document then.  I mean,

23 I need to ask you questions.

24         And if you just -- if you're gonna spend the

25 whole time saying, oh, you need to look at the documents;

1  us when you want us to zoom on things and we'll do it, Mr.

2  Wolfson, okay?

3      A.  Yeah, if you could bring that up to 110 percent.

4  I don't need reading glasses, but when it's from a screen

5  it gets a little blurry.

6      Q.  I can't read it either, so you don't need to

7  apologize.

8      A.  I'm 25 percent perfect.

9      Q.  All right.  So what is this document, Exhibit 6?

10     A.  This is an application for funding, it's a Lendio

11  application.

12     Q.  Who filled this out?

13     A.  So not being there, but I did look up what

14  Lendio's website and how they operate.  This is filled out

15  by the applicant through Lendio's online portal.

16     Q.  Do you know that for a fact, about that is was

17  filled out by Mr. Keith?

18     A.  I could not know that for a fact.

19     Q.  Okay.  So, you're just making assumption of how

20  this document was generated; is that correct?

21     A.  Uh, yes.

22     Q.  And if we go down.  So, the information on this

23  document --

24             MR. DUNNAM:  Go ahead and scroll down,

25  Ms. Ratliff.  I want to make sure Mr. Wolfson could see it

DAVID WOLFSON  -  July 06, 2023

```
 1        Q.  All right, number five.  What's false about
 2   number five?
 3        A.  Because he clearly closed his business.
 4        Q.  You know why he closed?
 5        A.  He took our money and closed very quickly.
 6        Q.  Do you know why he closed?
 7        A.  He wanted to close.
 8        Q.  He wanted to close, that's your testimony?
 9        A.  I didn't ask him.  Nobody --
10             MS. LALLY:  -- objection, cause for
11   speculation.  He's not Mr. Keith.
12        A.  Nobody got an answer from him.
13        Q.  (Examination By Mr. Dunnam)  What did he do with
14   the money that y'all loaned him?
15        A.  I don't --
16             MS. LALLY:  -- objection, cause for
17   speculation.
18        Q.  (Examination By Mr. Dunnam)  Do you know what he
19   did with the money?
20        A.  I just said I don't know.
21        Q.  Does it matter what he did with the money?
22        A.  It could.
23        Q.  How?
24        A.  Did he go on vacation?
25        Q.  Did he go on vacation?
```

DAVID WOLFSON  -  July 06, 2023

1    A.  I don't know.

2              MS. LALLY:  Objection, cause for

3   speculation.

4    Q.  (Examination By Mr. Dunnam)  You're sitting here

5   today, you've sued this client, my client, for fraud

6   stealing this money.  And you don't know what he did with

7   the money; is that what you're saying?

8    A.  I personally do not know what he did with the

9   money.

10   Q.  Does Kapitus know what he did with the money?

11   A.  I don't know.

12   Q.  Who should I ask?

13   A.  I do not know.

14   Q.  Who should I ask at Kapitus, whether or not

15  Kapitus knows what he did with the money.

16   A.  I already answered, I don't know.

17   Q.  Do you -- so let's go back.  Does it matter to

18  Kapitus what he used the money for?

19   A.  It does.

20   Q.  And what would be a proper use of the money?

21   A.  The money is supposed to be used for a legitimate

22  business purpose; for example buying equipment.

23   Q.  What about paying off a supplier; is that a

24  legitimate purpose?  A supplier of materials for the

25  business?  Is that --

1  Let's assume that, okay.  And there's a company called

2  Foxworth in central Texas.  And they sell building

3  materials, lumber, doors, things that are used to build

4  houses.  Okay?

5          Would his use of those funds to pay Foxworth,

6  the building supply company, be an appropriate use of

7  funds that were extended to a builder?

8      A.  If it was for a building project he was working

9  on, it would be.

10     Q.  Okay.  An operating capital, what is that?  What

11 does that mean?

12     A.  That's a really broad definition of anything you

13 need for operations of your business.

14     Q.  Which would be paying ongoing obligations, that

15 would be a proper use, that would be operating capital.

16 That's what you use operating capital for, right?

17     A.  Yeah.

18     Q.  Either salaries or supplies or materials, or

19 whatever you need to operate your business; that's a

20 proper use of operating capital, correct?

21     A.  It should be, yes.

22     Q.  Okay.  Do you know what the difference between a

23 secured debt and unsecured debt is?

24     A.  Yes.

25     Q.  And we talked about the use of these funds that

1  of what happened -- even without going into every little
2  detail of a man's day-to-day life, would support being a
3  fraudulent allegation.
4      Q.  Okay.  Well first off, I didn't say he planned to
5  file bankruptcy.  I asked you why would somebody pay an
6  unsecured creditor if they were planning to file
7  bankruptcy.  So I just want to make sure the record is
8  correct on that.
9          But do you know why?  So, you think you --
10  you per say, pay one couple weeks, stopped paying us.  Do
11  you know why he stopped paying you?
12          MS. LALLY:  Objection, cause for
13  speculation.
14      A.  We don't know why exactly because when he
15  contacted him, when there was a problem he ignored us.
16      Q.  Well, you know now.  This lawsuit has been going
17  on for a while.  Do you know why --
18      A.  -- I'll tell you I do not know why.
19      Q.  So sitting here today as a company
20  representative, Kapitus does not know why he stopped
21  paying y'all, right?
22      A.  No, I don't know.  I don't know why.
23      Q.  Who should I ask?
24      A.  I don't know.  You've asked me this already.
25      Q.  And so going back to your things that said

1    A.  So that was the default fee.

2    Q.  And what's the default fee?

3    A.  So the contract provides for a fee in the event

4 of a default.  The default fee it's listed there.  It

5 would be in the financing contract that we just reviewed.

6        There should be a list of fees in events of

7 default in there.  So on this one he's what we funded

8 113,000.  So he defaulted when the balance was balance was

9 108,356.  And because this event of default you kick in

10 the 2,500 fee.  That's how you come to the $110,856.

11    Q.  Well, you said you funded -- you just said you

12 funded 113,000, but he only got 77,600 in his pocket.

13    A.  You are correct, I'm misspeaking.  So it's an

14 80,000 funding which after the origination fee was 77,600.

15        So it's a factoring agreement, so there's a

16 purch -- receivables purchased amount was what?  113,000.

17    Q.  Uh, something like that.

18    A.  If you play with so many numbers back, I mean,

19 the contract, the documents are gonna have the exact

20 details.  So forgive me if we vary a little bit.

21    Q.  Well, let's go back up.

22    A.  No payments were made, so the balance at the time

23 that whatever triggered the event of default is 108,356.

24    Q.  And payments were due daily?

25    A.  I -- what the contract called for.

1  up another document.  I'm gonna call this Exhibit 13.  And

2  I'm gonna see if you know what this is.  I'm gonna ask Ms.

3  Ratliff to scroll through this document.

4      A.  Right.  Can we enlarge it again, 125 seems to

5  work.  Thank you.

6      Q.  Okay.  What is Exhibit 13?

7      A.  So this looks like e-mails.  Could you go from

8  Kapitus -- could you just scroll down so I can see the --

9  where it's coming from.

10          Okay.  These are e-mails that contain,

11  what's this?  Portals or drop boxes of different

12  documents.  I know what they are.  I don't handle them

13  myself.  So, it's rare that I see.

14      Q.  Okay.  So when we look at this document, and

15  let's scroll up a little bit.  It talks about viewing the

16  submission.  Who has access to view that submission?

17          Does Mr. Keith?  Or is it just Lendio that --

18  let's just scroll up 'cause it has a couple of boxes that

19  I assume you can click.  Here's one that says log on to

20  portal.  It's involving Mr. Blake Brock.  There was a view

21  document button.

22          Mr. Keith's not on any of these.  And so ids

23  it accurate that Mr. Keith has no access to log on to that

24  portal reflected on Exhibit 3; or view the documents

25  reflected on Exhibit 13?

DAVID WOLFSON - July 06, 2023

1    A.   I don't see Mr. Keith on the e-mail chain.

2    Q.   Right.

3    A.   That's the only reason I have to agree with you.

4    Q.   Okay.

5    A.   This is through contract.  And then again, I know

6  what it is; I don't deal with that directly.  And that is

7  an answer for -- if you want to submit a request, I'll

8  find out the exact detail on.  But I don't see Mr. Keith

9  on there.

10          So I would say it's highly unlikely.  It

11  looks like it's between -- I'll -- well, from cont -- I'm

12  contract admin; that our internal people who process the

13  application.  And Villa is Jennaro Villa.  So this looks

14  like it's mainly between Kapitus and Lendio.

15    Q.   Okay.  Who is Jennaro Villa?  He's at lendio?

16    A.   No.  Jennaro Villa is the sale's manager here at

17  Kapitus.  So, an ISO would have a point of contact here to

18  deal with.

19    Q.   Why is it that when you look at Team Villa you

20  said that's to Lendio?

21    A.   No, no, no.  I said Team Villa is Jennaro Villa.

22  I think I saw Lendio on another one of the e-mail chains.

23    Q.   Let's go -- let's go down.  Let's look at this

24  Exhibit 13.  Well, there's Ganesh Mohan?

25    A.   Ganesh works at Kapitus.

DAVID WOLFSON  -  July 06, 2023

1   this was some kind of preferential payment to a friend, or

2   brother, or on a debt that wasn't owed?  Do you have any

3   evidence of that?

4        A.  I have no idea.

5        Q.  You care?

6        A.  Do I care?

7        Q.  Yeah, do you care where he spent the money?

8        A.  Yeah, I'd like to know where the money went.

9        Q.  Okay.  And have you ever asked anyone?  He=y,

10   what did he do with the money?

11        A.  Yeah, I asked the lawyers who were involved in

12   the case if they knew --

13        Q.  -- did you see this check?

14        A.  I'm seeing it now.

15        Q.  Okay.  And so, this is material document, you

16   agree with me?  In fact, it's a legitimate check.  It's

17   not a forgery or something.

18             The day he got the money from you he paid --

19   what I represent to you to be was the supplier, a vendor,

20   right?  Tex Mix, I think that means mixed concrete, okay?

21   I may be wrong.

22             But it's somebody like that, right?  Concrete

23   people.  And paid them 25,000 of your $77,600, okay.  You

24   got that?

25        A.  Okay.

DAVID WOLFSON  -  July 06, 2023

1      Q.  And assuming that's what he did with the funds;

2  do you see anything sinister, inappropriate?  You have any

3  evidence that this was some kind of defrauding-you deal?

4                  MS. LALLY:  Objection, it assumes a lot

5  of facts not evidence, and it cause for a legal

6  conclusion.

7      A.  Exactly, I have no idea.

8      Q.  (Examination By Mr. Dunnam)  Well, so that's my

9  issue, Mr. Wolfson.  You sued my client -- larceny, fraud,

10 embezzlement.  And you don't even know what he did with

11 the money?

12                 How is that reasonable?  Do you just sue

13 everybody that doesn't pay you?

14     A.  No.

15                 MS. LALLY:  Objection, argumentative.

16     Q.  (Examination By Mr. Dunnam)  So, why didn't you

17 -- why didn't you know until today, which is -- I don't

18 years after you filed the lawsuit, what he even did with

19 the money?

20                 MS. LALLY:  Objection, mischaracterizes

21 his testimony.

22     Q.  (Examination By Mr. Dunnam)  Well, you didn't

23 know what he did with the money until you saw this Exhibit

24 No.21, right?

25                 MS. LALLY:  Objection it assumes a fact

1   not in evidence.

2       Q.  (Examination By Mr. Dunnam)  Is that right, is

3   that a correct statement?

4       A.  Yes.

5       Q.  So, why would you accuse someone of fraud,

6   embezzlement, and larceny; not even knowing what they did

7   with the money?

8               MS. LALLY:  Objection, argumentative, it

9   assumes a fact not in evidence and is also calling for

10  legal conclusions.

11      Q.  (Examination By Mr. Dunnam)  You understand my

12  question?

13      A.  Yeah, I understand your question.  This isn't a

14  divorce proceeding.  So, I'm not even gonna answer this

15  one.

16      Q.  Why aren't answer?

17      A.  Ask me a question that is relevant to this.

18  We're not on -- in front of the judge here.

19      Q.  Well, we are.  Because this process can be played

20  to a judge or a jury.  This has the same affect as if

21  you're in front of judge or a jury.

22              Your oath is just as binding now as it would

23  be in courtroom.  Do you understand that?  You understand

24  that?

25      A.  Listen, I don't know what's gonna happen in

1  court.  All I know is my oath's binding.  I don't know and
2  we'll move on with this.
3      Q.  Well, I'm not moving on with it yet because do
4  you agree that you, Kapitus, has sued my client for fraud,
5  embezzlement, and larceny?
6      A.  Yes, we do.
7      Q.  And why did you sue my client making those
8  allegations not even knowing what he had done with the
9  funds?
10     A.  Because as stated before several times, when you
11 look at the circumstances under which this happened it is
12 not unreasonable to infer that he committed all of those
13 acts.
14          So, you can present a whole bunch of new
15 stuff here now that came out discovery, was not available
16 when the lawsuit was started.
17     Q.  We all participated in the bankruptcy proceeding,
18 right?
19          MS. LALLY:  Objection.  First of all, I
20 don't think that he's noticed up for the bankruptcy
21 proceeding in general.  I don't know if he can testify to
22 that at all.  He might not know the answer.
23     Q.  Did you participate -- did Kapitus participate in
24 a bankruptcy proceeding?
25     A.  I don't remember if someone from here did, or a

1      But not even caring what the spend the funds

2   for.  And calling somebody guilty of larceny,

3   embezzlement, and fraud; yeah, I've got a problem with

4   that, Mr. Wolfson.  Do you have a problem with that?  Or

5   do you think that's okay behavior?

6             MS. LALLY:  Objection, you're badgering

7   the witness, you're being argumentative.

8      A.  Perhaps he should have taken our phone call and

9   answered an e-mail, we wouldn't have to be here.

10     Q.  (Examination By Mr. Dunnam)  Okay.  Well, let's

11  go back to Exhibit No.21 real quick.  I just want to show

12  you something.  We got to the bottom of that page, you'll

13  see there's a document number, key000 number one, okay?

14            And the Exhibit No.22 is the number Keith

15  five zeros and a two.  And I'll represent to you that that

16  would indicate that these are the first two documents we

17  gave you in this case, potentially a year ago.

18            So, there's not -- I'm not trying to throw

19  something at you, you know.  I don't know why you haven't

20  seen it, that ain't my problem.  Let's look at Exhibit 23

21  'cause we -- we want to talk about what did Foxworth do

22  after they got 50 grand, okay?  This is a pleading,

23  Exhibit 23.  And do you have it right or not?  So, I'll

24  represent --

25     A.  -- larger would be better.

1      Q.  Okay.

2      A.  Come on.

3      Q.  But now that you know, assume what I showed you

4  is accurate, what he did with the money; and you said

5  earlier that if it was used to pay these vendors that

6  would be proper use of operating capital.  You still

7  believe this gentlemen or his company committed

8  embezzlement, larceny, and fraud?

9                   MS. LALLY:  Objection.

10     Q.  (Examination By Mr. Dunnam)  You still belive

11  that?

12     A.  Yeah.

13                   MS. LALLY:  Objection, it assumes facts

14  not in evidence --

15     Q.  -- you still believe that?

16                   MS. LALLY:  It cause for legal

17  conclusion as to what embezzlement, larceny, and fraud

18  are.  And mischaracterizes and misstates private

19  testimony.

20     Q.  (Examination By Mr. Dunnam)  You still think he's

21  guilty of --

22     A.  -- yes.

23     Q.  And the only basis for that is he stopped paying

24  real quick, checked out his business relatively soon, and

25  filed bankruptcy couple months later.  That's your basis

DAVID WOLFSON - July 06, 2023

```
1   for it all, right?
2       A.  That's how I inferred it, yes.
3       Q.  Okay.  So this entire lawsuit is based on this
4   inference; is that right?
5              MS. LALLY:  Objection, cause for legal
6   conclusion.
7       Q.  (Examination By Mr. Dunnam)  Your entire claims
8   are based on that inference, it smells bad?
9       A.  Does it?
10             MS. LALLY:  Same objection.
11      Q.  (Examination By Mr. Dunnam)  Not when you know
12  all the facts.  But going back to my question.  This
13  entire lawsuit, all your claims are based on this
14  inference you've made.
15             That Kapitus has made from the timing of when
16  he stopped paying, when he went out of business, when he
17  filed bankruptcy, and him not returning some phone calls?
18      A.  And the documentation that was submitted, and the
19  representations made when he applied for the funding.
20             Which you are arguing was not him.  We're
21  saying it was.  And this will come out at trial, sir.
22      Q.  I'm not saying this wasn't him.  I'm asking you
23  if you know who did it?  That's all I'm asking.
24      A.  And I answered that.
25      Q.  Okay.
```

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3   IN RE:                    §   CASE NO. 22-60559
                               §
 4   DONALD VINCENT KEITH AND  §
     JOCQUALINE SUSAN KEITH    §
 5                             §
     DEBTORS                   §   CHAPTER 7
 6                             §
                               §
 7   KAPITUS SERVICING, INC.,  §
     AS SERVICING AGENT FOR    §
 8   KAPITUS, LLC              §
     Plaintiff,                §
 9                             §   ADV.PROC.NO. 22-06003
     VS.                       §
10                             §
     DONALD VINCENT KEITH      §
11   Defendant.                §

12        _____

13                     ORAL DEPOSITION OF
                         DAVID WOLFSON
14
                         JULY 6, 2023
15        _____

16

17

18                I, Janie Garcia, Notary in and for the

19        State of Texas, hereby certify to the following:

20             That the witness, David Wolfson, was duly sworn

21        by the officer and that the transcript of the oral

22        deposition is a true record of the testimony given by the

23        witness;

24             That the original deposition was delivered to

25        Mr. Dunnam.
```

**DAVID WOLFSON - July 06, 2023**

1  That pursuant to information given to the deposition

2  officer at the time said testimony was taken, the

3  following includes counsel for all parties of record:

4  Mr. Dunnam                Attorney For Defendant

5  Ms. Lally                 Attorney For Plaintiffs

6

7          I further certify that I am neither counsel for,

8  related to, nor employed by any of the parties in the

9  action in which this proceeding was taken, and further

10 that I am not financially or otherwise interested in the

11 outcome of the action.

12

13         Certified to by me this 17th day of July 2023.

14

15

    Janie Garcia
16  Notary Public in and for
    The State of Texas
17  Commission Expires: 08-17-25
    Firm Registration No.50
18  Cen-Tex Reporting Service
    13809 Research Boulevard, Suite 500
19  Austin, TX 78750
    (512) 672-8665

20

21

22

23

24

25