

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 09, 2024.**

_____
**MICHAEL M. PARKER**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| DONALD VINCENT KEITH & JOCQUALINE SUSAN KEITH, | § § § § | CASE NO. 21-60559-MMP |
| DEBTORS. | § § | CHAPTER 7 |
| KAPITUS SERVICING, INC., AS, SERVICING AGENT FOR KAPITUS, LLC | § § § § § | |
| PLAINTIFF, | § § | |
| V. | § § | ADVERSARY NO. 22-06003-MMP |
| DONALD VINCENT KEITH, | § § | |
| DEFENDANT. | § | |

1

OPINION

I. **INTRODUCTION**

The Court tried Plaintiff's *Complaint to Determine Non-Dischargeability of Debt and for Denial of Dischargability of Debt Owed to Kapitus Servicing, Inc., as Servicing Agent for Kapitus LLC* [sic] ("**Complaint**," ECF No. 1)[1] filed by Plaintiff Kapitus Servicing, Inc., as Servicing Agent for Kapitus, LLC ("**Kapitus**"). In the Complaint, Kapitus seeks to have certain debts of Donald Vincent Keith ("**Keith**") declared nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).[2] Before trial, the Court granted Keith's *Motion for Summary Judgment* in part, dismissing all of Kapitus' claims save the claim under § 523(a)(2)(B). After hearing a trial on the merits, the Court finds Keith's debts to Kapitus nondischargeable under § 523(a)(2)(B).

II. **JURISDICTION**

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference of the United States District Court for the Western District of Texas, dated October 4, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409. Both Plaintiff and Defendants have consented to the entry of final orders and a judgment by this Court in this adversary proceeding. ECF Nos. 68 and 69.

III. **BACKGROUND**

This dispute arises from a forward purchase agreement ("**Agreement**")[3] between Keith's former business Coyote Design and Build LLC ("**Coyote**") and Kapitus, signed August 9, 2021. Pl.'s Ex. 4. Keith guaranteed Coyote's financial obligations under the Agreement. *Id.* at 16.

---

[1] "ECF" denotes the electronic filing number.
[2] All statutory references are to Title 11 of the United States Code unless otherwise specified.
[3] Generally, under a forward purchase agreement parties agree to buy or sell an asset at an agreed upon price at a future date or upon a specified future event. Under the Agreement here, Defendant's Exhibit C, Kapitus paid $80,000.00 to purchase $113,600.00 of Coyote's receivables, to be delivered over time.

2

Keith and Coyote's discussions for financing began with Lendio Partners, LLC ("**Lendio**"). Lendio is an intermediary, matching parties seeking financing with those providing it. Keith sought operating capital for Coyote, and Lendio matched Coyote with Kapitus, who agreed to provide financing via a forward purchase agreement. Kapitus and Keith only communicated with each other through Lendio before the Agreement was signed. Pl.'s Exs. 1 & 20. Lendio put together an application, signed by Keith, and submitted it to their portal. Pl.'s Exs. 1 & 2.

Under the Agreement, Kapitus would purchase a percentage of Coyote's accounts receivable for $80,000.00 less $2,400.00 in closing fees. Pl.'s Ex. 4 at 1. In exchange, Coyote would give Kapitus 9.6% of its receipts each month until Kapitus had been paid back a total of $113,600.00. *Id.* To ensure payment, Kapitus took a blanket security interest in all of Coyote's property and a personal guaranty from Keith. *Id.* at 14-16. Kapitus also required Coyote to maintain an ACH debit account from which Kapitus could withdraw $616.00 daily in satisfaction of the Agreement. *Id.* at 4.

The Agreement included "Representations and Acknowledgements," ("**R&As**") under which Keith agreed, among other things, that he and Coyote did not plan to file for bankruptcy, he did not plan to sell Coyote, and that he and Coyote were current and not in arrears "on any business or personal loans or other financial obligations," except as previously disclosed to Kapitus. Def.'s Ex. 5. The R&As also required Keith to acknowledge that Kapitus was relying on the representations made in the R&As, and that "any false statements or misrepresentations made to obtain funding constitute fraud" and would subject Coyote to legal action. *Id.* at 2. Keith signed

3

the Agreement and the R&As on August 9, 2021. Pl.'s Ex. 7. The same day, Kapitus sent the receivables purchase price less fees under the Agreement of $77,600.00. Pl.'s Ex. 8.

After receiving the funds from Kapitus, Keith immediately used the funds to pay Coyote's vendors for previously supplied goods. Pl.'s Ex. 7; Def.'s Ex. 6 & 7. He paid $50,000.00 to Foxworth-Galbraith Lumber Company ("**Foxworth**") and $25,000.00 to TexMix, a concrete supply company. *Id.* The debt owed to Foxworth was under a previously executed credit agreement between Coyote and Foxworth. Pl.'s Ex. 33 at 12. Unbeknownst to Kapitus, Keith had personally guaranteed the debt owed to Foxworth. Pl.'s Ex. 29 at 35; Pl.'s Ex. 32 at 5.

Notwithstanding the $50,000 payment, Foxworth refused to do further business with Coyote and sent an "Intent to Lien" letter to Bancorp South, where Coyote maintained its interim construction accounts. Upon receiving Foxworth's letter, Bancorp South froze the accounts and Coyote ceased operations. Compounding issues, beginning on August 26, Kapitus's daily $616.00 draw was rejected due to insufficient funds in Coyote's ACH debit account. Pl.'s Ex. 46. Coyote ceased operations just a few weeks after Kapitus advanced funds to Coyote.

Foxworth then filed a state court lawsuit against Coyote and Keith for breach of contract on October 11. Pl.'s Ex. 33. Both Coyote and Keith personally filed for bankruptcy in late 2021. Coyote, which by then had virtually no assets, moved quickly through liquidation and its case was closed with no distribution to creditors. ***In re Coyote Design and Build, LLC***, Case No. 21-60560-mmp. Similarly, Keith's case had no distribution to creditors, generally discharged the Keiths' debts and quickly closed.

Kapitus filed this adversary proceeding, asking the Court to find nondischargeable Keith's personal guaranty of Coyote's performance under the Agreement.

4

IV.     DISCUSSION

A chapter 7 debtor can receive a discharge of most debts. § 727(a). Section 523, however, excepts from discharge debts Congress has deemed nondischargeable. While § 523 protects certain creditors, it should be strictly construed against the objecting creditor and liberally construed in favor of the debtor. ***Boyle v. Abilene Lumber (In re Boyle)***, 819 F.2d 583, 588 (5th Cir. 1987). An objecting creditor must prove nondischargeability by a preponderance of the evidence. ***Grogan v. Garner***, 498 U.S. 279, 291 (1991).

Kapitus seeks a nondischargeability determination under § 523(a)(2)(B).

Under § 523(a)(2)(B), a debtor may not receive a discharge for debts obtained by the "use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property or services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."

Kapitus alleges that Keith's signature and affirmation of the provisions in the R&As were materially false and induced Kapitus into entering the Agreement. Under the R&As, Keith represented via signature that "[n]either my business nor I are in arrears on any business or personal loans." Keith also represented in the Agreement that "[n]either my business nor I plan to file for bankruptcy…within the next 12 months." Kapitus argues that both statements were material misrepresentations. Kapitus contends that Keith was significantly in arrears to trade creditors when he signed the R&As. Kapitus notes the speed at which Foxworth levied Coyote's bank account and filed a state court action, notwithstanding the $50,000 paid to Foxworth from the proceeds of the Agreement. As to Keith's representation on his plans for filing bankruptcy, Kapitus points out

5

that Coyote ceased operating within weeks of Kapitus's advance of funds to Coyote and filed for bankruptcy within five months of entering the Agreement.

Keith argues that he was not in arrears with Foxworth when the Agreement was signed. Despite Keith's failure to comply with the terms of his agreement with Foxworth requiring payment to Foxworth within 30 days, Keith asserted at trial that in his course of dealing with Foxworth, he was never considered in arrears if payments were made within 90 days. Keith also argues that he did not plan to file for bankruptcy when the R&As were signed, and that the bankruptcy filing resulted from Foxworth's Letter of Intent to Lien and the ensuing freezing of Coyote's bank account.

i) **A Statement in Writing**

Section 523(a)(2)(B) first requires a showing that the debtor made or published a statement in writing. The writing must have been "written, signed, or adopted and used by the debtor." *In re McCracken*, 586 B.R. 247, 255 (Bankr. S.D. Tex. 2018) (citing 4 COLLIER ON BANKRUPTCY, ¶ 523.08[2][a] (16th ed.)). Here, that requirement is easily met. By signing the R&A's, Keith was affirming the contents of the R&As as his own statement about whether Coyote was in arrears at the time. Kapitus does not rely on any oral misrepresentations made by Keith, as Keith and Kapitus never directly contacted each other before the agreement was signed. Because Keith's written affirmation of the R&As via signature qualifies as a "statement in writing" under § 523(a)(2)(B), Kapitus has met this element of § 523(a)(2)(B).

6

### ii) Materially False

Next, § 523(a)(2)(B) requires a showing that the debtor made a statement (in writing) that was "materially false." A statement is materially false under § 523(a)(2)(B) if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." ***In re Jordan***, 929 F.2d 221, 224 (5th Cir. 1991) (citations omitted) (overruled on separate grounds).

Kapitus argues that two of Keith's statements were materially false: Keith's affirmation that he did not plan to file bankruptcy after entering the Agreement, and Keith's representation that he was not in arrears when he entered the Agreement.

First, although it's a close call, the Court hesitates to hold that Keith's affirmation that he did not plan to file bankruptcy for 12 months after entering the Agreement qualifies as a "materially false statement." Although it is true that Keith ended up filing for bankruptcy within five months of signing the R&As, Kapitus has not carried its burden to show that, by a preponderance of the evidence, Keith was planning to file for bankruptcy within 12 months of signing the R&As. Keith testified that he had not approached a bankruptcy attorney until thirty days after receiving the funds from Kapitus. The bankruptcy filing could have been triggered by Foxworth's lien on Coyote's accounts, which froze the accounts and essentially shut down Coyote's operations. The Court finds that Kapitus has not shown Keith's statement regarding his intent to file bankruptcy to be "materially false," and the statement therefore does not satisfy this element of § 523(a)(2)(B).[4]

---

[4] Because the Court finds that this statement fails to meet this element of § 523(a)(2)(B), the rest of this opinion shall not analyze the statement using the rest of the statute's elements.

7

The Court does find, however, that Keith's representation that he was not "in arrears" at the time of signing the R&As was materially false. On a contractual level, Keith's credit agreement with Foxworth treated charges as due on the 1st of the month following when charges were incurred, and that charges were only considered "past due" if they were not paid by the 15th of that month. Pl.'s Ex. 32 at 8. According to Foxworth's complaint filed in state court on October 12, 2021 ("**Foxworth Complaint**"), Keith still had outstanding invoices dating back to May 20, 2021. Pl.'s Ex. 33 at 5-6. A majority of the outstanding invoices were for charges incurred during June 2021, which according to the credit agreement with Foxworth would have been considered "past due" on July 15th, 2021. As stated above, Keith signed the R&As on August 9, 2021. The invoices that had become past due in July and which Foxworth still considered past due when they filed the Foxworth Complaint in October were "past due" when Keith signed the R&As. Therefore, Keith was contractually "in arrears" when he signed the R&As affirming that he was not. That was a false statement.

The Court finds that this misrepresentation was material. From their subjective viewpoint, representatives from Kapitus testified that they regularly rely on the R&As to determine whether financing should proceed and at what rate the financing should be provided. The Court also finds that information about Coyote's arrearages is the type of information that would "normally affect the decision to grant credit." *Jordan*, 929 F.2d at 224.

At trial, Keith sought to direct the Court to Coyote's course of dealing with Foxworth instead of the contractual language. In prior pleadings, Keith had said Foxworth had never held him "in arrears" unless he had not paid within ninety days of the invoice date. And at trial, Keith testified that despite the Foxworth credit agreement, he paid Foxworth from statements (not

8

invoices) which calculated amounts due from the 20th of a month to the 20th of the next month. Keith pointed to an example of a statement which was sent to Keith on November 30, 2021, and had a due date of December 10, 2021. Def.'s Ex. 22. The statement included charges stemming all the way back to May 2021. Keith argued that he only ever paid based on the statements, and that Defendant's Exhibit 33 proves that Foxworth would not have considered him "in arrears" when he signed the R&As in August.

Keith's argument fails. Keith's self-serving statements are not credible and are insufficient when weighed against other admitted evidence, especially when other, non-self-serving evidence could have easily been proffered. The Court did not hear any testimony from, nor did the Court receive any exhibits with information from, employees or representatives of Foxworth supporting Keith's understanding of the course of dealing with Foxworth. The only evidence that would support Keith's course-of-dealing argument came from Keith's personal testimony. The timing of Foxworth's letter of intent to lien and the later state court lawsuit significantly undermines Keith's testimony. If Keith's version of when bills were due to Foxworth is correct, it is unclear why Foxworth's written agreement with Keith stated otherwise and why Foxworth would sue Keith for another $84,000 in state court right after receiving a $50,000 payment from the proceeds of the Agreement. To the contrary, this would show that Keith was in arrears at the time of Kapitus's funding and remained so even after the $50,000 payment.

Keith's gesture toward the November 2021 Foxworth statement appears to undermine his argument even further. The statement contains outstanding charges for all the invoices cited in the Foxworth Complaint. If Keith's argument is that Foxworth's statements only show what is *currently* due (and not what is "past due" or "in arrears"), the fact that the November 2021

9

statement includes charges for which Foxworth *had filed suit for failure to pay* would heavily discredit Keith's view of Coyote's and Foxworth's course of dealing.

The Court thus finds that Keith's signature on the R&As qualifies as a "materially false statement" under § 523(a)(2)(B) because he misrepresented whether he was "in arrears" at the time of signing the R&As.

### iii) Respecting the Debtor's or an Insider's Financial Condition

The third element requires that the written, materially false statement be in respect to the debtor's (or an insider's) financial condition. Both Coyote and Keith are "insiders" of each other under the definition in § 101(31), so both of their financial conditions can be referenced by the materially false written statement. A statement "respects" a debtor or an insider's financial condition if it "has a direct relation to or impact on the debtor's overall financial status." ***Lamar, Archer & Cofrin, LLP v. Appling***, 584 U.S. 709, 720 (2018).

Keith's statement that he was not "in arrears" is a statement respecting his and Coyote's financial condition. In ***Appling***, the Supreme Court held that a statement about a single asset was a statement respecting the debtor's financial condition because it showed whether a debtor is "able to repay a given debt or not." ***Id.*** Keith's arrearages would have an impact on his ability to repay a given debt, and it therefore qualifies as a statement respecting his and Coyote's financial condition.

### iv) On Which the Creditor Reasonably Relied

The fourth element examines the reasonableness of a creditor's reliance. The Fifth Circuit has set forth three factors to consider when determining the reasonableness of a creditor's reliance

under § 523(a)(2)(B): (i) a creditor's previous business dealings with the debtor which would give rise to a relationship of trust, (ii) any "red flags" that would have alerted an ordinarily prudent lender, and (iii) if "even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Matter of Osborne*, 951 F.3d 691, 698 (5th Cir. 2020) (citing *In re Coston*, 991 F.2d 257, 261 (5th Cir. 1993) (en banc) (per curiam)). Even though a lender must undertake some investigation of the debtor's statements, "[a] creditor is not required to assume that a debtor is lying or misrepresenting facts in a financial statement." *David W. Morrison Western Builders of Amarillo, Inc. v. Morrison*, 361 B.R. 107, 123 (Bankr. W.D. Tex. 2007).

The Court finds that Kapitus reasonably relied on Keith's statements under § 523(a)(2)(B). Keith did not have any previous dealings with Kapitus that would give rise to a relationship of trust. The Court also finds that at the time of the Agreement, Keith did not have any glaring red flags which would put a lender on notice as to Keith's ability to repay the debt, nor did Kapitus fail to investigate Keith and Coyote.

Representatives from Kapitus testified about the extensive review process involved in their forward purchase agreements. First, Keith supplied six months of bank statements to Kapitus's agent, Lendio, which included the statements in its portal submission looking for lenders. Steven Podhorzer, Kapitus's Senior Vice President of Underwriting, testified that Kapitus also relied on a risk score provided by its proprietary borrower risk modelling software, which itself aggregates "hundreds of variables." These variables include credit bureau reports which provide detailed credit histories of applicants. After the risk model, Kapitus then has an individual underwriter review the documents provided, review the bank statements provided using a service called Oculus, look to see if other similar merchant lenders have made advances to the applicant, search

11

for personal judgment or UCC liens and criminal records, and perform a comprehensive background search using a service called Clear. The underwriter then follows up this extensive review process with a Google search of the applicant for any further adverse findings.

Based on Mr. Podhorzer's testimony about Kapitus's underwriting process, the Court finds that Kapitus reasonably relied on Keith's representations in the R&As. Had Kapitus *only* relied on Keith's signature on the R&As, this element of § 523(a)(2)(B) probably would not have been met. But coupling the applicant's personal representations with the extensive public records search of information about Coyote and Keith, the Court finds that Kapitus took steps that rise above "minimal investigation" that would reveal the falsity of Keith's statement that he was not "in arrears." Until Foxworth filed suit in October 2021, there would have been no record of Coyote's arrearages to Foxworth publicly available. While Keith argued at trial that Kapitus's failure to request profit and loss statements and a list of creditors demonstrated a lack of reasonable reliance, Mr. Podhorzer's testimony on the underwriter's use of Oculus to evaluate Coyote's actual bank statements and determine Coyote's cash flow and creditors would abrogate the need for Coyote's own profit and loss statements. The Court finds it reasonable for lender to place reliance of the cash flow analysis that can be gleaned from objective bank statements over the use of sometimes subjective and manipulable profit and loss statements that a debtor may produce. The Court finds that Kapitus reasonably relied on Keith's statement in the R&As.

### (v) That the Debtor Published with Intent to Deceive

Finally, § 523(a)(2)(B) requires a showing that the debtor published a materially false statement with an "intent to deceive." This evaluation "hinges on the credibility of witnesses," requiring a court to assess the credibility and demeanor of the debtor. ***In re Alvarado***, 608 B.R

12

877, 885 (Bankr. W.D. Okla. 2019). A court should look at the "totality of the circumstances and infer an intent to deceive when 'reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine' to produce such an inference" **In re Morrison**, 555 F.3d 473, 482 (5th Cir. 2009) (quoting **In re Miller**, 39 F.3d 301, 305 (11th Cir. 1994)).

The Court finds that Keith had the requisite intent to deceive when he signed the R&As because his signature reflected a reckless disregard for the truth or falsity of the R&As. At trial, Keith testified that he may not have fully read the R&As and that it's possible he signed it "blindly." If true, Keith's failure to read the R&As would amount to a reckless disregard for the truth or falsity of the statements it contained. Further, Keith admitted at trial that the $25,000 check to TexMix had been written prior to receiving funding from Kapitus. Although this wouldn't necessarily show he was in arrears when he signed the R&As, it shows impending pressure from creditors and Keith's state of mind while he was applying for credit from Kapitus (pressure and intentions which were not disclosed to Kapitus). The Court finds that Keith's testimony that he did not know he was in arrears lacks credibility, especially considering when (i) Coyote (via Keith) wrote checks and made large payments to Foxworth ($50,000) and TexMix ($25,000) (right after Kapitus purchased receivables), and (ii) Foxworth sued Coyote to recover its debt (right after it received $50,000 from Coyote). The Court finds that Keith had the requisite "intent to deceive" for purposes of § 523(a)(2)(B).

V. **CONCLUSION**

Thus, the Court finds Keith's debt of to Kapitus to be non-dischargeable under § 523(a)(2)(B). This debt includes $108,025.20 in principal, $18,716.48 in pre-judgment interest

at the Virginia legal rate of 6% annually calculated from August 20, 2021, through July 9, 2024, $2,500.00 in default fees, and $150.00 in ACH fees, for a total of $129,391.68 in non-dischargeable debt. Kapitus has carried its burden by a preponderance of the evidence to show that Keith made a materially false written representation which would render the debt he owes non-dischargeable. The Court will enter a separate judgment to this effect.

# # #